THE COMMONWEALTH OF PUERTO RICO, ETC. and the
Puerto Rico Housing Authority, Plaintiffs and Appellees, v. Martín Aguayo, Defendant and Appellant.

No. 11601. Resubmitted March 24, 1958.—Decided June 27, 1958.

*Jorge V. Toledo* for appellant. *J. B. Hernández Badillo, Attorney General* (*José Trías Monge, Ex-Attorney General* on the brief) and *Aurelio Torres Braschi* for the Commonwealth. *R. B. Pérez Mercado* for the Puerto Rico Housing Authority.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

On February 10, 1955, the Commonwealth of Puerto Rico and the Puerto Rico Housing Authority, as plaintiffs,

and Martín Aguayo, as defendant, submitted to the Superior Court, Division of Eminent Domain, a stipulation on condemnation pursuant to the provisions of Rule 7(d) of the Rules of Civil Procedure.

After the usual statements on the juridical personality and legal powers of the plaintiffs, the parties stipulated the following facts:

On June 10, 1953, the Authority adopted Resolution No. 763, declaring "slum district" and "blighted area" the place known as "La Playa" in the municipality of Arecibo, by virtue of which the state and federal governments and the municipality of Arecibo agreed to advance financial aid for the redevelopment of that area. The conditions prevailing in the slum of *La Playa* which warrant the action of the Authority. are described.

In that place there is a certain property owned by Aguayo which cannot be classified as a "slum" or "blighted area," but the elimination of which, the plaintiffs allege, is essential to carry out adequately the redevelopment project.

The litigants are agreed on the value of the property in question ($2,850) but do not agree to make a voluntary sale, and the Housing Authority, plaintiff herein, has therefore adopted a resolution authorizing the taking of said property.

There exists between the parties "a substantial controversy by reason of opposite criteria" as to the constitutionality of the laws which authorize the redevelopment plan. The defendant maintains that such laws "are unconstitutional and wholly void, and that all the resolutions, contracts, determinations, things, and actions of the plaintiff by virtue of such laws are void and have no legal effect whatever. . . ."

The defendant alleges, briefly, that the legal provisions are unconstitutional because they authorize: (a) the condemnation of private property for private use; (b) the condemnation of unused lands and of structures which are in good condition; (c) the use of state, municipal and

Authority funds, and the issuance of bonds and cash loans for the aforesaid purposes; (d) the taking of lands for a price lower than the purchase price; (e) the undue delegation of legislative powers to the Authority; and (f) the powers granted to the Authority to own lands in excess of 500 acres. He maintains, further, that such laws are void because they contain more than one subject, without expressing them in their titles, and because they have not been re-enacted by the Legislative Assembly after the approval of the Constitution of Puerto Rico.

Attached to this document was an affidavit signed by César Cordero Dávila, in his capacity as Executive Director of the Authority, and by Martín Aguayo, "setting forth that the facts stipulated in this case present a real and substantial controversy," and that "this action is filed in good faith for the purpose of settling such controversy." That affidavit was subscribed and sworn to in Arecibo [1] on February 1, 1955, before notary public Efraín Ramírez Ramírez.

Copies of the resolutions bearing on the case which were adopted by the Authority, the Planning Board, and the municipality of Arecibo were presented to the court together with the aforesaid documents and a check for the sum of $2,850 was deposited "at defendant's disposal."

On March 10, 1955, the Superior Court, without holding a hearing and without having required or received written memorandums of the litigants, entered an order entitled "Statement of the Case, Findings of Fact, Conclusions of Law, and Judgment." In this order the court reproduced the facts accepted in the stipulation, and it also took judicial notice "of the living and social conditions prevailing in many communities of Puerto Rico," particularly as regards the housing shortage. In its conclusions of law the court determined that the "facts stipulated present a real and substan-

---

[1] Although the affidavit reads "San Juan," it was established at the hearing in this Court that it was signed in Arecibo.

tial controversy as to the legal rights and prerogatives of the plaintiff which warrant a court order." It then examined the pleadings of the defendant and dismissed all the constitutional objections interposed by him. Lastly, the court rendered judgment sustaining the complaint and the condemnation of defendant's property.

On the following March 11, the defendant appealed to this Court. On April 4, he filed a motion in the Superior Court claiming the sum deposited by the Authority, and binding himself "to refund the sum involved in this case when the possession of his property was restored to him." The court set the motion for hearing, but thereafter ordered the delivery of the funds to the defendant with plaintiffs' acquiescence. There appears in the record a document signed by Martín Aguayo, in San Juan on April 29, 1955, in which he acknowledges receipt of a check for the sum of $2,850 from Luis M. Cabañas, the court's clerk.

On May 22, 1955, the defendant-appellant filed his brief in this Court, while plaintiffs filed theirs on July 21 of that year. On October 8, 1957, the parties made a motion which in its pertinent part reads as follows:

"1.—In order to avoid the consequences that might be produced by certain statements made in the press in connection with this case and which are bound to give a wrong impression, the parties wish to state that they have a great interest that this case should follow its normal course and that it be adjudicated by this Court.

"2.—The parties take this opportunity to state further that they believe that a final disposition of this case by this Hon. Supreme Court, on the basis of the issues raised, is of extraordinary importance as a matter of public interest, and that they anxiously await a determination."

In view of that motion and of the statements of attorney Efraín Ramírez Ramírez which were published in El Mundo newspaper (edition of September 12, 1957), in which, "as attorney for Martín Aguayo," he asserted that "some time

ago Aguayo sold his property to the Authority without the need of condemnation" and that the case "was and is being prosecuted for purposes other than those alleged, and since a sale of the property has already been executed, the case is moot," on January 2, 1958 this Court ordered a hearing "for the purpose of determining whether this suit has been filed in good faith, whether there exists a real and substantial controversy between the parties, and whether this Court should consider and pass upon the constitutional questions raised by the appeal." Martín Aguayo, César Cordero Dávila, and Luis M. Cabañas, attorneys Jorge V. Toledo, Aurelio Torres Braschi, Rafael B. Pérez Mercado, Octavio Malavé Torres, Pablo Defendini, Efraín Ramírez Ramírez, and Rafael Rodríguez Ema were summoned to appear at that hearing, and notice of the order of the Court was served upon the Attorney General. The hearing was held on January 8 and 9, with all the persons mentioned present. All the persons summoned testified and those persons as well as the representative of the Attorney General had ample opportunity to cross-examine the witnesses and offer pertinent evidence.

On March 17, 1958, we sent to the litigants a copy of a certificate of the Registrar of Property of Arecibo attesting that the property involved in this litigation had never been recorded in that Registry in the name of Martín Aguayo, and we requested to be informed of "the effects, if any, that the registration status of the property might have on this appeal." On March 24, 1958, the corresponding reports were filed of record.

## I

It is well to analyze, in the first place, the power of the courts to determine whether or not the cases brought before them are collusive, academic, or fictitious. This power stems from the elementary principle that courts exist exclusively for the purpose of settling genuine controversies

between adverse parties having real interest in seeking some relief which will affect their juridical relations. This requirement is an outgrowth of the anthropological origin of the judicial bodies.[2] It is jurisdictional in character and it is ranked constitutional in several countries.[3] An indispensable complement of that limitation must be the inherent power and the duty of every court to investigate, whenever necessary, the circumstances surrounding the origin and development of litigation. That power has long been recognized in the Anglo-Saxon judicial system [4] and it is buttressed by a great number of cases.[5]

Perhaps no one has described that duty with greater clarity than the Supreme Court of Nevada in *Haley* v. *Eureka County Bank et al.*, 26 Pac. 64, 65 (1891).

"When actions are brought in a court of law, a duty devolves upon the judge, and that is scrupulously to guard its proceedings from being used by the parties collusively, and not suffer a judgment to be entered without being fully satisfied that a cause of action really exists as provided for by law. Whenever facts are placed before a court, which cause any suspicion that there is any collusion between the parties, no matter in what way or form the facts are brought to the knowledge of the court, it is the duty of the judge at once to institute such an examination as will satisfy him of the truth or falsity of the charge."

In *Lord* v. *Veazie*, 8 How. 250 (1850), Mr. Chief Justice Taney said (at p. 254):

[2] Jerome Frank, *Courts on Trial* 5–9 (1949).

[3] See Edwin Borchard, *Declaratory Judgments* 33 (1941), dealing with the experience in the United States, Australia, Canada, South Africa, New Zealand, Argentina, Brazil, Colombia, Perú, and Venezuela.

[4] In *Coxe* v. *Phillips*, 95 Eng. Rep. R. 152 (1736), cited in Diamond, *Federal Jurisdiction to Decide Moot Cases*, 94 U. of Pa. L. Rev. 125 (1946), it was held that an attempt to conduct a fictitious lawsuit was a contempt of court. The proceedings were stayed and the offending parties committed.

[5] Most of the American authorities are covered in Diamond, *op. cit.* at 126; Borchard, *op. cit.* at 81–86; Robertson and Kirkham, *Jurisdiction of the Supreme Court of the United States* 493–536 (1951).

"It is the office of courts of justice to decide the rights of persons and of property, when the persons interested cannot adjust them by agreement between themselves, —and to do this upon the full hearing of both parties. And any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehended, and treated as a punishable contempt of court."

The manner in which a court becomes aware of the facts showing that a suit is fictitious, collusive, or academic, or of the person that furnished the information, is of no consequence. It may be made formally by motion of one of the litigants or of a third party—*United States* v. *Johnson*, 319 U.S. 302, 303 (1943); *American Wood Paper* v. *Heft*, 19 L.Ed. 378, 75 U.S. 333, 334 (1869); *Cleveland* v. *Chamberlain*, 66 U.S. 419, 426 (1861); *Lord* v. *Veazie, supra* at 255; *Ward* v. *Alsup*, 46 S.W. 573, 574 (Tenn. 1898); *Haley* v. *Eureka County Bank, supra* at 64; or informally— *Walling* v. *Wholesome Food & Supply Co.*, 141 F.2d 331, 334 (C.C.A. 8, 1944); [6] *East Tenn., Va. & Ga. Railroad Co.* v. *Southern Telegraph Co.*, 125 U.S. 695, 696 (1888); [7] *Williams* v. *Simons*, 2 L.Ed. 2d 87, 91 (1958).[8] The United States Supreme Court has gone so far as to hold that a case is moot without indicating in its opinion the source of the evidence for such a determination. *Alton* v. *Alton*, 347 U.S. 610 (1954); [9] *Amalgamated Ass'n of Street etc., Employees* v. *Wisconsin Employment Relations Board*, 340

---

[6] Letter sent by an attorney to the clerk of the court.

[7] Letter sent by counsel to the court.

[8] "The District Court advised this Court of the order of dismissal of October 29th, and expressed their view that, since the issues presented by the case are moot, this Court should vacate its order to show cause."

[9] "Following argument and submission of the case in this Court, we were authoritatively advised that a final divorce decree had been entered on April 28, 1954, in the State of Connecticut on application of the respondent."

542

U.S. 416, 418 (1951).[10] The court may likewise obtain the necessary information from the record—*C.I.O.* v. *McAdory*, 325 U.S. 472, 475 (1945); *Coffman* v. *Breeze Corporations*, 323 U.S. 316, 324 (1945); *Chicago and Grand Trunk Ry. Co.* v. *Wellman*, 143 U.S. 339, 342 (1892); *Gardner* v. *Goodyear Dental Vulcanite Co.*, 131 U.S. App. CIII (1873); *Bartmeyer* v. *Iowa*, 18 Wall. 129, 134 (1873); *Atherton Mills* v. *Johnston*, 259 U.S. 13, 15 (1922); *Waiahua Agricultural Co.* v. *Maneja*, 178 F.2d 603, 606 (C.C.A. 9, 1949); *Moore* v. *Caldwell County et al.*, 176 S.E. 580 (N.C. 1934); *Navarro* v. *Calderón*, 61 P.R.R. 328, 330 (1945); *Echeandía* v. *Saldaña*, 61 P.R.R. 771, 777 (1945) —or from the admissions of the attorneys in the oral arguments—*Cover* v. *Schwartz*, 133 F.2d 541, 546 (C.C.A. 2, 1942); *Washington Market Co.* v. *District of Columbia*, 137 U.S. 62, 63 (1890); *Buck's Stove and Range Company* v. *A.F.L.*, 219 U.S. 581 (1911); *South Spring Gold Co.* v. *Amador*, 145 U.S. 300, 301 (1892); *St. Pierre* v. *United States*, 319 U.S. 41, 42 (1943). Also, by taking judicial notice in order to determine whether the controversy is already moot—*United States* v. *Hamburg-American Co.*, 239 U.S. 466, 475 (1915); *Mills* v. *Green*, 159 U.S. 651, 657 (1895); *Richardson* v. *McChesney*, 218 U.S. 487, 492 (1910); *Jones* v. *Montague*, 194 U.S. 147, 153 (1904). The facts may be shown to the court at any time before the decision of the case—*Little* v. *Bowers*, 134 U.S. 547, 558 (1889); *United States* v. *Johnson, supra* at 305—and the time the case has been pending does not affect the powers of the court. In *Little* v. *Bowers*, the United States Supreme Court held that it was its duty to dismiss a moot case which had been pending in the Court for more than three years and the causes alleged for dismissal were known to the parties for two years.

---

[10] "We are informed that this award was superseded by agreement...."

The court may direct the immediate dismissal of the cause if it finds that there is no real controversy between the litigants—*United States* v. *Johnson, supra* at 305; *C.I.O.* v. *McAdory, supra* at 478; *Amalgamated Ass'n of Street Employees* v. *W.E.R.B., supra* at 418; *Cleveland* v. *Chamberlain, supra* at 426; *Lord* v. *Veazie, supra* at 256; *Williams* v. *Simons, supra* at 87; *Title Guaranty & Trust Co.* v. *Mortgage Commission,* 3 N.E.2d 433, 434 (N.Y. 1936)—or may require them to submit further proofs by means of affidavits, written memoranda, or at a hearing—*American Wood Paper Co.* v. *Heft, supra,* 19 L.Ed. 379; *Macklin* v. *Kaiser Co.,* 69 F. Supp. 137; 138 (D.C. Oregon, 1946); *East Tenn., Va. & Ga. Railroad Co.* v. *Southern Telegraph Co., supra* at 696; *Bell & Howell Co.* v. *Bliss,* 262 F. 131, 133 (C.C.A. 7, 1931). If after proper investigation it is established that there is no substantial controversy, it is the court's duty, in view of the circumstances, to dismiss the proceeding from its commencement or to dismiss the appeal, without passing upon the merits of the issues.[11]

Although in the present action the parties made no formal objection to the proceeding instituted by this Court, the Housing Authority, plaintiff herein, has labelled it in its brief as "somewhat anomalous." It admits that "certain statements appeared in the press in connection with the case which this Court could not overlook and which called for immediate action," but it maintains that those statements were made by a person not a party to the action, and that he alone should have been summoned to substantiate or rectify them, without taking "court action in the case."

Obviously, the plaintiff is not right. In the first place, in their motion of October 8, 1957 before this Court the litigants expressly referred to "certain statements made in the press in connection with this case," and, consequently,

---

[11] See discussion and authorities cited in the opinion of Judge Jerome Frank in *Cover* v. *Schwartz, supra,* at 546, and in Robertson and Kirkham, *op. cit.* at 498.

they formally directed the attention of this Court to those statements. In the second place, and irrespective of the foregoing, those statements were made by Lic. Efraín Ramírez Ramírez, an officer of this Court, in the capacity of "attorney for Martín Aguayo," and they contain serious imputations as to the origin and prosecution of this case which affect the conduct of several attorneys and public officers and the authority and good name of the courts, and they therefore called for complete elucidation. Lastly, we fail to see why the plaintiff or its attorneys should complain of a proceeding in which this Court gave them every opportunity to account for their conduct and the circumstances of this case, and why they should have preferred a proceeding in which only the author of those imputations should be examined and in which the litigants would have been deprived of an opportunity to examine him and introduce additional evidence.

## II

The fact that this Court acted as a court of first instance at the hearings held on January 8 and 9 and the transcendency of those hearings, calls for a detailed recital of the facts which we consider proved. They are as follows:

Since 1949, the Puerto Rico Housing Authority was bent on finding some case in which to assail the constitutionality of urban-renewal laws, which the Authority itself has the duty to execute and enforce. Although the officers and attorneys of the Authority did not have (nor have) any doubt on the validity of such legislative provisions,[12] the persistent petitions of the officers in charge of the administration of the federal-housing program and of the attorneys for the firms which were going to purchase Authority bonds,

---

[12] In this connection, Cordero Dávila stated that "I believe, in fact, that there should not be any doubt." (Tr. Evid. 134.) Lic. Rafael B. Pérez Mercado, attorney for the Authority, set up a memorandum "in an effort to convince these attorneys [of the bondholders] that the laws were constitutional. . . ." (Tr. Evid. 355.)

led them to seek constantly for an opportunity to submit those laws to judicial scrutiny. Thereafter those petitions were converted into threats of cutting off federal aid,[13] alleging that substantial sums of United States funds were at stake, since it was not known whether or not the Commonwealth laws were constitutional. All the Authority attorneys, specifically, Lic. Rafael B. Pérez Mercado and Lic. Rafael Rodríguez Ema, were aware of this serious problem and were in search of some person interested in challenging those laws in court. This, however, was no easy task. As pointed out by Mr. Cordero Dávila in his frank and honest testimony: "We were then requested from Washington to find some way to establish in Puerto Rico whether or not the law was constitutional. Naturally, unfortunately for us—or we may say to make it difficult for us—in Puerto Rico, unlike the United States, there do not exist, or do not easily arise, entities or persons who may wish to hamper the program by seeking a decree declaring the law unconstitutional." (Tr. Evid. 76.) He added further: ". . . No one in Puerto Rico has shown a marked interest in hindering the program . . . we never had a case like this which someone would want to prosecute with vigor, with enthusiasm, and with great interest. . . ." (Tr. Evid. 99.)

Late in 1954, Lic. Rodríguez Ema, in the discharge of his functions as attorney for the Authority,[14] had a conversation with Martín Aguayo about the property which the latter owned in the ward of Playa de Arecibo. Rodríguez Ema testified that both Aguayo and other property owners objected to the taking of their properties by the Authority,

---

[13] Despite those threats, the aid continued to be given. Cordero testified that the Authority had received from federal agencies some $200,000,000, of which approximately one half was for the urban-renewal program. (Tr. Evid. 95, 96.)

[14] Rodríguez Ema testified that since 1953, he has a contract with the Authority under the Urban-renewal Program "to obtain from property owners the voluntary sale of their property in favor of the Authority." (Tr. Evid. 437.)

and that the former "was dissatisfied not only with the price they were going to pay him but also with the fact that his house was not falling apart like most houses, and that it was fairly good . . . ." (Tr. Evid. 438.) In view of this situation, Rodríguez Ema advised Aguayo that if he was not satisfied, "he could authorize the Authority to institute a condemnation proceeding and to plea his point of view in this Court." (*Id.*) In order to persuade Aguayo to accept this proposition, the attorney for the Authority offered gratuitously his personal services, including the appeal to the Supreme Court, and that the litigation would cost him nothing. He made this offer "in order to co-operate in resolving a situation confronting the Authority," and he would not have made it if that problem had not existed. (Tr. Evid. 441.)

Another essential reason for the offer appears from the following colloquy:

"Q.—Did your offer respond to your belief that that was the only way Aguayo would bring this action, that it would not cost him a penny, and all he would have to do would be to sign a paper?

"A.—Well, I know that if I charged him for doing it, he would not have done it. So, you are right." (Tr. Evid. 498.)

In the course of that conversation with Aguayo, the attorney for the Authority suggested some constitutional objections which could be raised, and refrained from expressing his opinion on the merits of the case, although he believed that the chances of success were adverse to Aguayo. Nor is there any evidence that Lic. Rodríguez Ema made any efforts to persuade Aguayo to sell the property of his own volition, despite the fact that "if people had objections, finally, after trying to dissuade many of them by all means available, we agreed to institute condemnation proceedings; that is, as a mater of public policy, we did not encourage mass condemnation if there were people willing to sell." (Tr. Evid. 439.) On September 9, 1954, Martín Aguayo

signed a letter, prepared by Rodríguez Ema "and a secretary of the Authority in Arecibo," which copied literally reads as follows:

Arecibo, P. R.
September 9, 1954

Lic. Rafael Rodríguez Ema
San Juan, P. R.
Sir:

In accordance with our conversation of today, I hereby authorize you to be my legal representative in the condemnation proceeding which the Puerto Rico Housing Authority has filed against me for the purpose of acquiring my property situated on Block H–47 of "La Playa," Arecibo. I hereby authorize you to accept as satisfactory the appraisal in the sum of $2,850 which I have been offered. You may raise on my behalf any question of law you may deem proper.

Very truly yours,

(s) Martín Aguayo.

It will be noted that on this date Aguayo had already accepted the price which he was offered for the property, that he speaks of a "proceeding which the Authority has filed against me . . ." (although the action commenced five months later), and that he authorizes the attorney for the Authority to bear his legal representation and "to raise any question of law you may deem proper."

In his testimony, Martín Aguayo substantially confirms the statements made by Lic. Rodríguez Ema. He also testified that he signed the letter of authorization without reading it and without consulting any other attorney, and that the affidavit attached to the stipulation was read to him but not the stipulation.[15] On numerous occasions in the

---

[15] Lic. Efraín Ramírez Ramírez, before whom the affidavit was sworn to, testified that the statement was read as a whole, "an extract." (Tr. Evid. 269.)

course of his testimony, both upon being examined by the Justices of this Court and by some attorneys who were in attendance, Martín Aguayo testified emphatically that his only interest in the case was the price they were going to pay him, and that such interest no longer existed after he received the money. It is true that on one occasion he said that he would not have sold his house "even for $5,000" (Tr. Evid. 56), but he made that statement after repeatedly stating that his only interest was the price,[16] a statement which he had previously reiterated[17] and ratified later.

---

[16] "Q.—Was it all right with you for the Authority to take your house for other purposes?

A.—Well, I did not think so.

Q.—You were not satisfied, you did not agree to the taking of your house?

A.—Yes, because they paid me less than its value.

Q.—But aside from the price they were going to pay you, did you agree or were you satisfied with the taking of your house?

A.—No, I was not satisfied.

Q.—You wanted to keep your house, right?

A.—I wanted more money because the house was worth more, and I was not satisfied with the price.

Q.—But, did you want to sell it and have your house taken, you wanted to get rid of it, or did you want to keep it?

A.—No, I would not have sold it, not even for $5,000.

Q.—So, you were not pleased to have your house taken?

A.—Of course not. I did not like it, but since. . . ." (Tr. Evid. 55–56.)

[17] "Q.—Mr. Aguayo, why do you say you are not interested?

A.—Well, because they paid me for the house. They paid me for the house and I am not interested in anything else.

Q.—Who paid for the house?

A.—The Government.

Q.—Did you receive the money?

A.—I received the money.

Q.—And were you satisfied with the price?

A.—I accepted the price and said it was all right. [Tr. Evid. 14.]

. . . . . . . .

Q.—You mentioned a suit with the Authority. Did you have a suit with the Authority?

A.—Well, they asked me to sign that and I signed it.

Q.—But, are you interested in proceeding with that suit?

A.—I have no interest at all.

Q.—Do you wish to proceed with this appeal?

A.—No.

"Q.—Now, tell me something, and this is my last question. I mean, I am going to put this question frankly. Do you feel that you are obligated to say that you have no interest in this case because you are testifying here, or are you testifying freely and spontaneously?

"A.—Well, since they paid me the money I no longer have any interest in anything.

"Q.—Has that been your attitude long before you were summoned?

"A.—Well, since they gave me the money. After giving me the money, I have no interest in this." (Tr. Evid. 68.)

Other testimonies confirm Aguayo's lack of interest. Cordero Dávila explains as follows the information which he received from the attorneys for the Authority as to Aguayo's attitude:

"I wished to make it clear, I meant to say it at the beginning, that no case had arisen showing . . . someone's desire and initiative to challenge the law. That case had not arisen. Now it did arise, the commentary, the impression given us that Aguayo was interested in bringing action. That's what happened. We could not say that it was Aguayo's own initiative; we did learn that he had made some comments as to the power of the Authority to acquire that property, and that he objected to the taking of his property. That was the impression I gathered from the case. Of course, it was not that he himself brought the action and that then we were faced with a suit; no. We learned that that was his desire and we then thought

---

Q.—Don't you want to proceed with it?

A.—I accepted the money already and I don't want to hear anything more about it. [Tr. Evid. 32–33.]

.        .        .        .        .        .        .        .

Q.—I mean, aside from the price, did you have any other controversy with the Authority?

A.—None. [Tr. Evid. 38.]

.        .        .        .        . .        .        .        .

Q.—Now, at this moment I am asking you, do you agree that the Authority should keep the property and that you keep the money, and you have no interest in the prosecution of this suit?

A.—That's exactly what I want; I don't want to be involved in any litigation.

Q.—You don't want to proceed with that suit?

A.—No, no. [Tr. Evid. 42.]

it was a godsend. Realizing that someone who was not completely satisfied with the taking of his property was interested in bringing such action, we were glad to have such a case because it settled the problem which we had and still have on our hands." (Tr. Evid. 80–81.)

Lic. Efraín Ramírez Ramírez, a neighbor and friend of Martín Aguayo, on several occasions talked with the latter about his relations with the Authority.

"Q.—Tell me, when this situation arose, didn't Aguayo consult you about the Authority's alleged right to take his property, to condemn his property?

"A.—On certain occasions he spoke to me; as friends we met some times and he spoke about it, but naturally, his attitude has always been obstinate.

"Q.—To . . . . ?

"A.—Not to litigate; he does not want to litigate; that is, his attitude always was not to litigate." (Tr. Evid. 273.)

Specifically, and shortly after certain statements appeared in the press about Aguayo and his suit with the Authority, Ramírez spoke with Aguayo.

"Q.—But, as to this property and the Housing Authority, what did Mr. Aguayo tell you on this occasion?

"A.—More or less what he testified here this morning.

"Q.—Will you be kind enough to repeat it?

"A.—That he had already received the money, that he had signed certain papers, that it was a closed matter for him.

"Q.—Did he tell you whether or not he still had any interest in this matter?

"A.—Really, I noticed that he was not interested, but I did not wish to inquire further." (Tr. Evid. 225.)

In the course of his testimony, Ramírez testified that Aguayo had told him that a sale between him and the Authority had been executed.

"What was the source for the colleague to assert that the sale of the property had been executed?

"A.—Mr. Aguayo himself.

"Q.—What did Mr. Aguayo tell you?

"A.—He said to me: 'I received the money, the amount; I have the money, I have sold that property and I do not. . . .'" (Tr. Evid. 216.)

Thereafter Ramírez clarified that Aguayo had not used the word "sale," but that when Aguayo explained it to him he said that he had "sold" his house to the Authority.

"Q.—Did he use the word sale or purchase and sale with reference to the property?

"A.—No, I was the one who used specifically the word sale for, according to his information, he had sold it, as he had also done with other properties.   (Tr. Evid. 226.)

.        .        .        .        .        .        .        .

"Q.—Counsellor, was there a sale, was there actually a sale?

"A.—Mr. Aguayo informed me that he had received his money and that he had signed certain papers.

"Q.—But did he not speak to you about a sale, as you said yesterday?

"A.—He spoke to me about a sale;  he spoke to me about a sale.

"Q.—Yesterday you said that he had not used the word sale.

"A.—No, Your Honor, he did not use it."  [Tr. Evid. 289–90.]

This is, naturally, the only logical explanation for the statements authorized by Lic. Ramírez and which were published in El Mundo newspaper, edition of September 12, 1957, in which he asserted that "Mr. Aguayo sold his property to the Authority long ago, without the need of condemnation."

In compliance with the offer made by its attorney, the Authority gave Martín Aguayo all the facilities necessary to prosecute the case in court without defendant bearing any part of its expense or being annoyed in any way.  Professional and secretarial services were provided to him free of charge, and all litigating expenses (fees, transcript, office supplies) were paid for him.  Aguayo did not have to appear in court, not even to receive the money deposited by

the Authority,[18] nor was he consulted on the different steps or issues in the case. With the possible exception of a ten-minute conference with Lic. Jorge Víctor Toledo (whom Lic. Rodríguez Ema selected to represent Aguayo), which Aguayo flatly denied having taken place, and of a conference with Lic. Rodríguez Ema and Lic. Ramírez to which we shall refer later, Martín Aguayo had absolutely nothing to do with the case. Lastly, the Authority permitted Aguayo to withdraw from the Superior Court the sum of $2,850, although it had not requested or obtained a declaration of taking and delivery of the defendant's property, and, consequently, it had not acquired title thereto.[19]

On October 8, 1957, Lic. Pablo Defendini and Lic. Jorge V. Toledo filed a motion in this Court in representation, respectively, of the Housing Authority and Martín Aguayo. The latter also signed the motion below the phrase "informed and agreed." This is the document which has been copied above in which the litigants, upon referring to certain statements made in the press, advise this Court of their interest in the decision of the case.

If on September 12, 1957, Lic. Ramírez Ramírez, after talking with Aguayo, stated that the latter had sold his property to the Authority and that the case was moot, how is it possible that a few weeks later Aguayo should have signed this motion? Two reasons account for this action. First, it is to be noted that the conflict between Ramírez' statements and the motion is more apparent than real. The motion merely sets out the interest of the parties in "the normal prosecution and adjudication of the case," and points out "its extraordinary importance as a question of public interest." But, notwithstanding the reference therein "to

---

[18] Aguayo testified that the check was delivered to him in Arecibo, although there is a receipt signed by him acknowledging receipt of the check in San Juan from Cabañas, the clerk of the Superior Court. The latter could not recall whether or not he delivered that check to Aguayo.

[19] 32 L.P.R.A. § 2907.

certain statements appearing in the press" and which, obviously, were none other than those made by Lic. Ramírez, it does not controvert directly the serious assertions made by Ramírez regarding the sale of Aguayo's property, and that the case "has been and is being prosecuted for purposes other than those alleged." In the second place, we are fully convinced that Martín Aguayo signed this motion only because his friend and neighbor, Lic. Ramírez, urged him to do so, appealing to his patriotism and civic duty, stressing the public importance of the matter, and urging Aguayo "to oblige." [20] On numerous occasions in the course of his testimony, Ramírez explained that those were the reasons alleged for obtaining Aguayo's signature.[21]

"Actually, I was not acquainted with the details of this case, but Aguayo himself informed me and he recited them here this morning. This notwithstanding, at the suggestion of colleague Rodríguez Ema, I made no further statement because he asked me not to and he later came to my office; he explained that it was a very important question of public interest; then my intervention was merely confined to arousing Aguayo's interest, if possible, as a matter of patriotism more than any-

---

[20] The Commonwealth admits implicitly that the only possible interest which appellant Martín Aguayo may have is the interest which arises from his "civic duty." In its brief, it urges this Court not to consider Aguayo as desisting from this proceeding, notwithstanding his repeated assertions that he does not wish to proceed further, unless he makes a formal motion for dismissal after giving him an opportunity "to mediate, in his home and in view of the recent developments which are at stake in this proceeding, whether he should act in accordance with the dictates of his civic duty and should not frustrate by his action a social reconstruction program of such a vast scope."

Aguayo was given in this Court every opportunity to express his views freely, and every time he insisted that he had no interest in the case and that he did not wish to participate. If the request is granted, it would mean that we would have to rule out as useless the basic method used in our judicial system for discovering the truth: the public hearing with an opportunity to examine and cross-examine.

[21] Rodríguez Ema testified (Tr. Evid. 478) that before calling on Aguayo, Ramírez told him that Aguayo was willing "to proceed with the action," and that at the next conference they spoke to Aguayo about "his interest, because, it seems to me, it [the case] has always been of public interest." (Tr. Evid. 480.)

thing else, of civic duty, in settling this matter, as a question of public interest. [Tr. Evid. 216.]

" .    .    .    .    .    .    .    .

"Q.—The conclusion you reached from your conversation with Aguayo was that Aguayo at that time had no interest in this matter; that, as far as the property is concerned, his relations with the Housing Authority had terminated?

"A.—He gave me that impression. Now, I wish to make it clear that later on I tried and attempted to arouse his interest in this matter, for reasons of civic duty and also of patriotism, since he owned another house. [Tr. Evid. 226.]

" .    .    .    .    .    .    .    .

"A.—Aguayo trusted me fully and said to me: 'All right.' He always made it conditional, that he does not like to be involved in litigation, that he is a man of peace and does not like to be involved in anything, and much less to spend money on litigation. But I explained to him that it was a matter of public interest in which many millions of dollars were at stake, according to my knowledge and to the press reports. He made no specific promise, but agreed to a certain extent.

"Q.—He agreed to what?

"A.—To comply with my wishes, to do his share in order to settle this case." (Tr. Evid. 227.)

Let us now turn to consider how the case developed and what was the Authority's control over it. We have pointed out already that it was Lic. Rodríguez Ema, attorney for the Authority, who selected Lic. Jorge V. Toledo to act as attorney for Martín Aguayo. This selection responded to reasons "of confidence, friendship, and neighborly relations." (Tr. Evid. 458.) Toledo and Rodríguez Ema had offices on the same floor of the building. Also on that floor were the offices of Lic. Rafael B. Pérez Mercado, then Chief of the Legal Division of the Authority. The agreement between Toledo and Rodríguez Ema as explained by the latter, was that Rodríguez Ema would see that Toledo's intervention should require "as little work as possible, such as clerical and research work and the like." (Tr. Evid. 459.) Rodríguez Ema asked Toledo to get in touch with Pérez Mercado for the final drafting of any papers.

Toledo in turn explained that he agreed to conduct the case "in order to cooperate with the colleague [Rodríguez Ema], who has also extended courtesies to me." (Tr. Evid. 161.) " . . . . the fact is that I was not intervening in that case . . . but rather as a courtesy to the colleague, and I did not handle every step. . . ." (Tr. Evid. 150.) And added: " . . . . I could not say that it was one of those cases in which I was expressly retained and one takes a special interest. Rather, it was the interest that I knew it was a matter of public interest to settle the matter, and the authorization which Aguayo had given me. So that my intervention consisted in all those relations, and I also consulted constantly Mr. Rodríguez Ema, who had handled from the commencement Mr. Aguayo's petition." (Tr. Evid. 161–62.)

As a result of the understanding with Rodríguez Ema, Toledo agreed to render his services gratuitously and to receive all kinds of help from the attorneys for the Authority. Notwithstanding the fact that important constitutional questions were raised in the case, Toledo did not move for a hearing in the Superior Court nor submitted a written memorandum in support of his client's contentions.

An examination of what happened between Toledo and Aguayo shows that attorney-client relations never existed between them. Aside from the facts already mentioned, that Aguayo did not engage Toledo as his attorney or paid for his services, other circumstances fully support the above conclusion. Toledo did not keep his client informed of the developments in the case. He did not inform him of the constitutional questions raised in the stipulation, nor of the judgment of the superior court, nor requested his consent to appeal from that judgment. Without showing it to Aguayo or speaking to him about the matter, he filed a motion in the Superior Court for leave to withdraw the funds deposited by the Authority, in which Aguayo bound

himself "to refund the sum involved in this case upon return of the ownership of his property." At the hearing, Lic. Toledo testified:

"When the appeal was taken, colleague Pérez Mercado had a conference with me at which he informed me that Aguayo wanted the money which was on deposit so he would not have to wait for a further decision. I did not mention the matter to Mr. Aguayo, but instead we drafted the motion and served notice to the other party; we then asked the court for the money and it was delivered to Mr. Aguayo. Actually, I don't know who delivered it to him." (Tr. Evid. 146.)

It also appears from this testimony that the only time that Aguayo needed to make a request in connection with his property, he went directly to the attorneys for the plaintiff and not to his official representative.

Rodríguez Ema testified that before signing the stipulation, Aguayo and he had a conference with Toledo, in the latter's office, which lasted ten to fifteen minutes. At that conference Rodríguez Ema said in the presence of Aguayo that they were going to raise in the case the question of ". . . . whether private property could be taken by condemnation and then sold to a private enterprise, and if his house came within what may be termed . . . ," and asserted that on that occasion the stipulation of facts already drawn up was not read to Aguayo. (Tr. Evid. 469.) Aguayo denied emphatically that such conference took place; he asserted that he had never been in San Juan on business connected with the case, and insisted that the first time he saw Toledo was in the Supreme Court, at the hearing held on January 8, 1958. We need not make a determination on this conflict of the evidence. Even accepting Rodríguez Ema's theory, that conference is by itself clearly insufficient to disturb the conclusion arising from the other facts in the sense that between Toledo and Aguayo there never existed a true attorney-client relationship.

Conclusive proof of the foregoing is Toledo's conduct following the publication in the press of Lic. Ramírez's state-

ments. It will be recalled that Ramírez, as "attorney for Martín Aguayo," asserted that the latter had sold his property to the Authority, that the case was "moot," and that it was being prosecuted for purposes other than those alleged. What did Toledo do when he learned of these serious imputations which called in question his relations with Aguayo and his professional responsibility in the case? Instead of ascertaining personally whether or not they were true,[22] he delegated to the attorneys for the Authority [23] the task of interviewing Aguayo, and considered that his professional duty was discharged by signing, together with Aguayo and one of the attorneys for the Authority, a motion directed to this Court in which the parties thereto merely allege that they are interested in prosecuting the case, but without denying the serious imputations published in the press. To this we must add that Toledo could not have personal knowledge of the arguments which were adduced to persuade Aguayo to sign the motion; that Toledo examined the motion before Rodríguez Ema took it to Arecibo, but thereafter Lic. Ramírez and the attorneys for the Authority eliminated a paragraph therefrom and, as thus modified, it was signed by Aguayo; and, lastly, that there is no proof that it even occurred to Aguayo to ask at the conference what was the opinion of his attorney. In the light of all the facts recited, there is no doubt that Lic. Jorge V. Toledo was not actually at any time attorney for Martín Aguayo

---

[22] In his testimony Toledo admitted that "perhaps I did not act correctly by not going to Arecibo immediately. . . ." (Tr. Evid. 167.)

[23] Rodríguez Ema testified that he went to Arecibo "for the purpose of clarifying the situation to colleague Toledo. . . ." (Tr. Evid. 487.) Lic. Pablo Defendini, who succeeded Lic. Pérez Mercado as Chief of the Legal Division of the Authority, testified that he had advised that the motion be submitted to this Court "in view of the difficult position in which colleague Toledo was apparently placed, in my opinion, in this case" (Tr. Evid. 409), and that he accompanied Rodríguez Ema to Arecibo because he was under the impression that the latter "was bearing the representation of colleague Toledo." (Tr. Evid. 434.)

in this proceeding and that his representation was simply nominal.

In addition to the full control which we have described, the attorneys for the Authority performed other acts which gave them complete control of the litigation. The stipulation made at the commencement of the case was drawn up by Lic. Rafael B. Pérez Mercado, then Chief of the Legal Division of the Authority. At the hearing he testified:

"Then I got in touch with colleague Toledo—by the way, we have offices in the same building; Rodríguez Ema as well as Toledo and myself have offices in the same building. We discussed the main issues in controversy. He spoke to me mainly about Mr. Aguayo, that his land and house was not a slum house, well in fact it was not; it was in good condition, had sanitary service, the street was in good condition; all in all, that there was no problem of sanitation. In view of that, I suggested to colleague Toledo: 'Well, if you are going to raise the question that this legislation is unconstitutional as to that aspect, it would be better to submit once and for all other questions and as many more as may arise, so that we may obtain a definitive and ample adjudication in which all the constitutional questions that might arise be conclusively decided'. And I said that knowing, as I did, the objections of this New York firm which represents the bondholders, the investors, to invest the funds of their clients without making sure that there would be no problem as to the invalidity of the Act. Well, Toledo agreed. We sat down, we argued, and for several days we discussed the questions to be raised and the possible objections to the laws; I made note of all the questions which might possibly be involved and those which could be raised, and then I drafted the stipulation in my office, put it in final form as it would be presented to the court to commence the action. Of course, in that stipulation I tried to present to the Court the whole problem of renewal. . . ." (Tr. Evid. 342–44.)

From then on the case was handled entirely by the attorneys for the Authority, who drew up and submitted to the Superior Court all the pertinent papers, with the exception of the notice of appeal which was prepared by Toledo. The

stipulation, the draft of the opinion and judgment, the motion to withdraw the funds, and the transcript of the record were the responsibility of the attorneys for the Authority.

The Authority continued to exercise the same control after the case reached this Court. Its attorneys were in charge of all proceedings and actually controlled the issues by controlling the briefs for both parties. The brief for the plaintiff, as was logical, was drawn up by the principal attorney, Lic. Pérez Mercado, in consultation with Lic. Aurelio Torres Braschi, Chief of the Litigation Division of the Department of Justice. However, the preparation of the brief for the defendant Martín Aguayo was entrusted principally to Lic. Antonio J. Amadeo, whose professional relations with the Authority were the same as those of Lic. Rodríguez Ema. The latter explained the situation as follows:

"Q.—If Amadeo was, so to speak, the attorney for Mr. Aguayo, I mean, why did he not sign the pleadings in the suit?

"A.—Because I did not ask Amadeo. And if I had asked him, he would have had my same problem.

Q.—In other words, Amadeo was in fact in control of Aguayo's suit together with Toledo?

"A.—I don't believe I could say that.

"Q.—But if he set up the brief in the appeal? I mean, the attorney who draws up the brief controls the appeal.

"A.—Well, he made the entire research to substantiate that brief. And a substantial part of that brief.

"Q.—So, you would not say that he controlled the appeal?

"A.—No, part of it.

"Q.—If a controversy had arisen as to the questions to be raised or how they should be argued, the manner of presenting them, would he not have had, since he was making the research, to determine how they were going to be raised and in what manner?

"A.—Undoubtedly, yes." (Tr. Evid. 464–65.)

It will be recalled, also, that the motion of October 8, 1957, in which the litigants expressed their interest in the

case and their desire that this Court should decide the same, was prepared by the attorneys for the Authority, who, together with Lic. Ramírez, also spoke with Martín Aguayo in order to persuade him to sign it.

It is very significant also, and it constitutes further proof of the complete control which the Authority had over this case and of the peculiar relations between Martín Aguayo and Lic. Jorge V. Toledo, that after the hearing held on January 8, at which his client time and again testified under oath that he never had nor did have any interest in this case, Toledo has not offered any explanation or raised any point in this Court despite the fact that he knows that both the Authority and the Commonwealth have submitted memorandums alleging that Martín Aguayo is interested in this case and that the same should be decided on the merits. Again, the attorney for Martín Aguayo has delegated the representation of his client to the attorneys for the Authority.

Other actions on the part of the Authority point to its complete control of the litigation. As pointed out before, the Authority permitted Martín Aguayo to withdraw from the Superior Court the sum of $2,850 after the defendant filed his notice of appeal and without the Court having decreed the acquisition of the property by the plaintiffs. The title to the property, under those circumstances, still belongs to the defendant,[24] and the Authority's only legal protection for those public funds, in the event of an adverse judicial determination, is a promise made by the attorney for Martín Aguayo, without the latter's consent, to return the money received by him in the event of an adverse judgment. It is obvious that in such event, and if there is no voluntary refund, the Authority would have to bring an action against Aguayo to compel him to return the money.

In the second place, the Authority ordered and carried out the complete demolition of Aguayo's house although it

---

[24] This was admitted by Lic. Pérez Mercado in his testimony.

never obtained title to the property, and, consequently, it is open to a suit for damages, and although the defendant's promise to refund the money is conditioned on the restitution of his property.

There is only one explanation for these actions: the complete assurance of the officers and attorneys of the Authority that Martín Aguayo has not had nor has any personal interest in this matter, and that the Authority's control of the litigation assures it, regardless of the final outcome, that the public funds will not be jeopardized. If this explanation is rejected, those actions would reveal official negligence in protecting the Authority's money.

In brief, the overwhelming weight of the facts proved before this Court shows conclusively: First, that the Housing Authority, plaintiff herein, took every step to bring this action and participates in the suit for the sole purpose of obtaining an opinion of this Court on the constitutionality of the urban-renewal laws and thus dispel any doubt which certain federal officers and the attorneys for the Authority bondholders may have. Second, (a) defendant Martín Aguayo has never had nor has any personal and real interest in this litigation and does not wish to proceed with the same; (b) at first he consented to appear as defendant because that action did not entail any expense on his part and meant no trouble for him; (c) upon receiving the money from the Authority he thought he had sold his property to it; and (d) he agreed thereafter to proceed with the litigation for reasons of "patriotism and civic duty" and "to oblige" a friend. Third, there can not be a scintilla of doubt that the Housing Authority controlled completely both sides of this litigation (a) by selecting the attorney for the defendant, (b) by bearing all the expenses, (c) by assuming charge of all proceedings, (d) by controlling the study and drafting of all papers (except the petition for appeal), including the stipulation and the briefs for both parties, and (e) by regulating, through its attorneys, the relations be-

tween the defendant and his attorney and converting them into purely nominal relations. Only by altering the facts to conform them to a preconceived result could we arrive at different conclusions.

### III

The parties interposed the present appeal pursuant to Rule 7(d) of the Rules of Civil Procedure, which provides as follows:

"(d) *Agreed case; Procedure.*—Parties to a dispute which might be the subject of a civil action may, without pleadings, file in the court which would have had jurisdiction if an action had been brought, an agreed statement of facts, supported by an affidavit that the controversy is real and substantial and that it is filed in good faith to determine the rights of the parties. The matters shall then be deemed an action at issue and all proceedings thereafter shall conform to these rules."

There has never existed a similar provision in the federal rules nor in our Code of Civil Procedure,[25] although they do exist in a majority of the states. The extraordinary similarity between the texts leads us to believe that ours was taken from Colorado,[26] although California[27] and New York[28] also have very similar rules.

There can be no question as to the purpose of Rule 7(d). It is to give the litigants, whenever there is no dispute between them on the facts, a speedy and inexpensive method to obtain a court decision and to submit eventually to a court

---

[25] Both in the federal and in our jurisdiction the parties may submit stipulations of facts after an action is commenced in the ordinary way. The federal authorities are covered in 2 Am.Jur., *Agreed Case* § 3, p. 366. As to Puerto Rico, see *Fajardo Development Co.* v. *Camacho et al.*, 31 P.R.R. 799, 803 (1923). The main distinctions between an "agreed case" and a "stipulation of facts" are discussed in 2 Am. Jur. 367, and in 97 A.L.R. 301.

[26] The rules are identical except for two slight differences in style and that our rule, contrary to that of Colorado, requires that the controversy be "real" and also "substantial." 1 Colo. Stat. Ann. 29 (1935).

[27] Deering, *Civil Procedure and Probate Codes of California*, § 1138 (1949); West's *Am. Cal. Codes, Civil Procedure*, § 1138 (1955).

[28] Civil Practice Act § 546, *Thompson's Laws of New York* 1688 (1939); 23 Abbott, New York Digest 2d 809 (1955).

of appeals questions of law which are in controversy. *Marx v. Brogan*, 81 N.E. 231 (N.Y. 1907); Annotation in 97 A.L.R. 301. It tends to eliminate the long and often tedious proceeding required by ordinary process, making a direct submission to the court and dispensing with the making of pleadings, summons, incidental motions, and evidence.

Notwithstanding these advantages, the "agreed case" still has, by operation of the law and of the Constitution, the essential characteristics of a judicial proceeding. It is necessary that there be a real controversy between the parties, submitted in good faith to a competent court and which might be the subject of judicial adjudication. The judgment of the court must conform to the stipulated facts and shall have the same effects as if rendered in an ordinary trial.

Our Rule 7(d) incorporates these essential requirements. It requires that the controversy be "real and substantial," thereby placing even greater emphasis on this requirement than the provisions of Colorado, California, and New York. This requirement becomes more evident by the use of the phrases "a dispute which might be the subject of a civil action" and "an action at issue." There is no doubt, therefore, that Rule 7(d) is not only no exception to the basic rule which requires that there be a real controversy between the parties to an action, but also, and obviously for the purpose of eliminating fictitious, collusive, and academic actions,[29] it expressly requires the parties to attest under oath both to their good faith and to the existence between them of a "real and substantial controversy."

We must therefore examine the content of the term "real controversy." It is not necessary, however, to explore the infinite variations and the innumerable refinements which have been added to it by hundreds of courts and dozens of commentators through the past centuries from its origin

---

[29] *Nott v. Klein*, 285 N.Y.S. 1025, 1026–27 (1935).

in the common law until the present time. It is sufficient, for the limited purposes of this opinion, to examine the specific problems presented in this case.

The United States Supreme Court has held [30] that the "controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." It must be "real and substantial" admitting "of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." It must be "appropriate for judicial determination" and "is distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot."

One of the most widely accepted definitions is that a moot case, on the contrary, is "one which seeks to get a judgment on a pretended controversy when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy."[31]

One of the essential elements of a real controversy is the adverse or opposing interest of the parties. There may be adverse interests without hostility between the litigants, and the courts not only approve but encourage "friendly suits." [32]  Actions whose motive is *to test* a law or official

---

[30] *Aetna Life Insurance Co.* v. *Haworth,* 300 U.S. 227, 240 (1937), and cases therein cited; *Muskrat* v. *United States,* 219 U.S. 346, 356 (1910); 1 *Cyclopedia of Federal Procedure* 112 (1951). ". . . . Courts do not sit for the purpose of determining speculative and abstract questions of law or laying down rules for the future conduct of individuals in their business and social relations; but they are confined in their judicial action to real controversies wherein the legal rights of parties are necessarily involved and can be conclusively determined. . . . " *Bianchi* v. *Pierazzi et al.,* 25 P.R.R. 587, 592 (1917). See 2 Bancroft, *Code Pleading, Practice and Remedies* 1325–26 (1937).

[31] *Ex parte Steele,* 162 Fed. 694, 701 (N.D. Ala. 1908).

[32] *Lord* v. *Veazie, supra; Ward* v. *Alsup, supra; The Fajardo Development Co.* v. *Camacho,* 31 P.R.R. 799, 803 (1923); *Ex parte Steele, supra; Florsheim* v. *Board of Commissioners,* 212 Pac. 451, 453 (N.M.

action are likewise acceptable.[33]  At all times, however, and regardless of the motives of the parties, there must be a genuine and live controversy involving adverse interests and which, upon adjudication, affects the juridical relations of the parties.[34]

". . . . The court must merely be alert to distinguish the fictitious or collusive suit, where only information or opinion is sought, or where the defendant appears as a lay figure only for the purpose of obtaining jurisdiction, from those in which rights are placed in issue with the purpose of a binding determination. . . ."  Borchard, *op. cit.* at 39.

We find no difficulty in establishing such distinction in this case.  The defendant himself testified under oath in this Court that he had never had nor at present has any

---

1922); Anderson, *Actions for Declaratory Judgments* 167 (1951); Borchard, *op. cit.* at 38.

[33] *Adams* v. *Union R. Co.*, 42 Atl. 515, 517 (R. I. 1899); *State ex rel. Attorney General* v. *Dolley*, 108 Pac. 846 (Kan. 1910); *W. E. Bowen Improvement Co.* v. *Van Haff ten*, 238 S.W. 147 (Mo. 1922); Borchard, *op. cit.* at 38; Anderson, *op. cit.* at 169.

[34] "The suit is spoken of, in the affidavits filed in support of it, as an amicable action, and the proceeding defended on that ground.  But an amicable action, in the sense in which these words are used in courts of justice, presupposes that there is a real dispute between the parties concerning some matter of right.  And in a case of that kind it sometimes happens, that, for the purpose of obtaining a decision of the controversy, without incurring needless expense and trouble, they agree to conduct the suit in an amicable manner, that is to say, that they will not embarrass each other with unnecessary forms or technicalities, and will mutually admit facts which they know to be true, and without requiring proof, and will bring the point in dispute before the court for decision, without subjecting each other to unnecessary expense or delay.  But there must be an actual controversy, and adverse interests. The amity consists in the manner in which it is brought to issue before the court.  And such amicable actions, so far from being objects of censure, are always approved and encouraged, because they facilitate greatly the administration of justice between the parties.  The objection in the case before us is, not that the proceedings were amicable, but that there is no real conflict of interest between them; that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be. . . ."  *Lord* v. *Veazie, supra* at 254.

interest in the action, and that he does not want to proceed with it. Other testimony fully confirms this assertion and sets out the reasons for bringing the action and why the defendant agreed to appear in and proceed with the suit. In the second place, the evidence establishes conclusively that the Housing Authority, plaintiff herein, had complete control of both sides of the litigation from its commencement until the present time. These elements are clearly sufficient to hold that the case before us is moot, that it was brought for the sole purpose of obtaining an opinion of this Court on the constitutionality of the urban-renewal laws and thus dispel any doubt which certain federal officers and attorneys for the Authority's bondholders may have.[35]

We do not believe the first aspect requires further juridical analysis. It having been established that one of the parties never had any interest in the action, or that that interest no longer exists owing to certain circumstances, or that it is clearly unsubstantial or transitory, the appeal should be dismissed for lack of a real controversy. Diamond, *op. cit.* at 130–31; Borchard, *op. cit.* at 38–40; Anderson *op. cit.* at 58; Robertson and Kirkham, *op. cit.* at 494–96, 509–17, 518–36, 541–78; *Lord* v. *Veazie, supra; Bell & Howell Co.* v. *Bliss, supra; Smith* v. *The Junction Railway Co.,* 29 Ind. 546 (1868); *Williams* v. *Van Deusen,* 219 S.W.

---

[35] The manner in which the sovereignty and autonomy of the state governments have been declining under the unexpected growth of the federal government is at the present time the source of much preoccupation to the rulers and to those who pursue studies of the federal system of North America. One of the causes of the present imbalance stems from the great economic strength of the federal government, which permits it to make grants-in-aid to the states at the same time that it imposes numerous requirements regarding the purposes for which federal funds may be used and the manner of spending them. A painstaking survey of the problem and the main sources is found in John Pryor Furman, *Impact of Federal Subsidies on State Functions,* 43 A.B.A.J. 1101 (1957). The experience of several federal systems, including the North American, is described in Robert R. Bowie and Carl J. Friedrich (editors), *Studies in Federalism* 360, 370–73 (1954), and in K. C. Wheare, *Federal Government* 101–03, 115–23, 158–59 (1953).

395, 397 (Mo. 1920); *Stearns* v. *Wood*, 236 U.S. 75 (1915); *Barley* v. *Johnson County*, 54 Pac. 80 (Cal. 1898); *Fairchild* v. *Hughes*, 258 U.S. 126 (1922); *Massachusetts* v. *Mellon*, 262 U.S. 447 (1923); *Sprunt and Sons* v. *United States*, 281 U.S. 249 (1930); *Arkansas-Missouri Power Co.* v. *City of Kennett*, 78 F.2d 911 (C.C.A. 8, 1935).

It is a well-established rule that there is no real controversy when in a litigation one of the parties becomes *dominus litis* of both sides. This condition thwarts the adversary character of the suit and compels the court concerned to dismiss the action. *Haley* v. *Eureka County Bank, supra; South Spring Gold Co.* v. *Amador Gold Co., supra; United States* v. *Johnson, supra; American Wood Paper Co.* v. *Heft, supra;* Robertson and Kirkham, *op. cit.* at 517. It is also contrary to public policy because it bars a fair and full judicial examination of the merits of the case. *O'Morrow* v. *Borad,* 167 P.2d 483, 486 (Cal. 1946). The main precedent in the federal jurisdiction is the case of *United States* v. *Johnson,* 319 U.S. 302 (1943). Because of the unusual similarity between the facts therein and those of this proceeding, we reproduce herein some paragraphs of the opinion of the United States Supreme Court:

"The affidavit of the plaintiff, submitted by the Government on its motion to dismiss the suit as collusive, shows without contradiction that he brought the present proceeding in a fictitious name; that it was instituted as a 'friendly suit' at appellee's request; that the plaintiff did not employ, pay, or even meet, the attorney who appeared of record in his behalf; that he had no knowledge who paid the $15 filing fee in the district court, but was assured by appellee that as plaintiff he would incur no expense in bringing the suit; that he did not read the complaint which was filed in his name as plaintiff; that in his conferences with the appellee and appellee's attorney of record, nothing was said concerning treble damages and he had no knowledge of the amount of the judgment prayed until he read of it in a local newspaper.

"Appellee's counter-affidavit did not deny these allegations. It admitted that appellee's attorney had undertaken to procure

an attorney to represent the plaintiff and had assured the plaintiff that his presence in court during the trial of the cause would not be necessary. It appears from the district court's opinion that no brief was filed on the plaintiff's behalf in that court.

"The Government does not contend that, as a result of this cooperation of the two original parties to the litigation, any false or fictitious state of facts was submitted to the court. But it does insist that the affidavits disclose the absence of a genuine adversary issue between the parties, without which a court may not safely proceed to judgment, especially when it assumes the grave responsibility of passing upon the constitutional validity of legislative action. Even in a litigation where only private rights are involved, the judgment will not be allowed to stand where one of the parties has dominated the conduct of the suit by payment of the fees of both. [Citation.]

"Here an important public interest is at stake—the validity of an Act of Congress having far-reaching effects on the public welfare in one of the most critical periods in the history of the country. That interest has been adjudicated in a proceeding in which the plaintiff has had no active participation, over which he has exercised no control, and the expense of which he has not borne. He has been only nominally represented by counsel who was selected by appellee's counsel and whom he has never seen. Such a suit is collusive because it is not in any real sense adversary. It does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court. [Citations.] Whenever in the course of litigation such a defect in the proceedings is brought to the court's attention, it may set aside any adjudication thus procured and dismiss the cause without entering judgment on the merits. It is the court's duty to do so where, as here, the public interest has been placed at hazard by the amenities of parties to a suit conducted under the domination of only one of them. . . ." (At 303–05.)

The plaintiffs seek to distinguish the *Johnson* case from the case at bar alleging that in the former there was "collusion between the private parties *against* the public inter-

est," while in the case at bar the "friendly agreement of the parties for submission of the controversy, if classed as collusive, would have to be termed collusion *in favor* of the public interest." (Italics by plaintiffs.) They maintain, further, that the Authority bore the expenses of litigation "without intent to prejudice any one and solely with the public interest in mind."

This reasoning has two essential defects. In the first place, it presupposes that the Authority's control over this litigation is based exclusively on the fact that it paid all the expenses thereof. The evidence, however, shows conclusively that this was only one aspect of the plaintiff's complete control of both sides of this proceeding.

Although the federal authorities hold that a suit is collusive merely because one of the parties pays the attorney's fees for all the litigants,[36] we have not adopted this principle in our jurisdiction. *Géigel* v. *Ramos*, 79 P.R.R. 812, 814 (1957). Nor has it been adopted by various states.[37] That is, without doubt, a fact to be considered in determining whether or not a case is collusive or moot, but there are situations, such as in *Géigel* v. *Ramos*, in which such practice is permissible. The attorneys should, however, inform

---

[36] *Gardner* v. *Goodyear Dental Vulcanite Co.*, *supra;* *Cleveland* v. *Chamberlain*, *supra;* *United States* v. *Johnson*, *supra.*

[37] In *City and County of San Francisco* v. *Boyd*, 140 P.2d 666, 670 (Cal. 1943), cited by the plaintiffs in support of their contention, the court said:

"... The fact that the opposing parties are authorized to employ attorneys who are paid from public funds does not render the suit collusive since the common source of such payment does not give one party control over the preparation and argument of the cause. There is nothing in the record before us which indicates that the board of supervisors selected counsel for respondent or exercised any control over the preparation or presentation of the case on behalf of respondent. ..."

See cases cited therein and, also, *Parker* v. *State*, 31 N.E. 1114 (Ind. 1892); *McCoy* v. *Carran*, 201 S.W. 463 (Ky. 1918); and *Cone* v. *Gilmore*, 155 Pac. 192 (Ore. 1916).

the circumstances to the court and the court, before proceeding with the case, should be satisfied that the action is neither collusive nor fictitious. We repeat, however, that in this proceeding the plaintiff not only bore all the expenses but also entirely controlled the litigation.

In the second place, the *Johnson* case is not distinguishable from the case at bar because there both litigants were private individuals and here public agencies appear as plaintiffs. The crucial test is whether or not this is a collusive, fictitious, or moot suit rather than who are the litigants. Obviously, we cannot permit any person, regardless of his status or category, to make improper use of the judicial proceedings. Nor do we know of any other jurisdiction where it has been permitted. *Cf. Meyers* v. *Cheesman,* 174 Fed. 783, 786 (C.C.A. 4, 1909); *People* v. *American Sugar Refining Co.,* 148 N.Y.Supp. 160, 164 (1914); *Muskrat* v. *United States,* 219 U.S. 346, 361 (1910); *Matter of De-Lucca,* 179 Pac. 853 (Cal. 1905); *Macklin* v. *Kaiser, supra* at 141.

In view of the findings of fact and the applicable law, we can not but conclude that this proceeding does not present a "real and substantial controversy," as required by Rule 7 (*d*) of the Rules of Civil Procedure. We need not, in view of this conclusion, examine the juridical problem whether or not the proceeding complies with the requirement of "good faith," also required by that rule, although later in this opinion reference will be made to this aspect of the case when judging the conduct of the litigants and attorneys.

## IV

It remains to decide what undoubtedly constitutes the backbone of this case: Should this Court make an adjudication on the merits of the questions raised in this proceeding in view of the undeniable public interest involved

therein? The plaintiffs urge that we ought to,[38] relying on *State ex rel. Att. Gen.* v. *Dolley*, 108 Pac. 846 (Kan. 1910) ; *Adams* v. *Union R. Co.*, 42 Atl. 515 (R.I. 1899) ; *Blaize* v. *Hayes*, 15 So. 2d 217 (La. 1943) ; *Rowe* v. *Housing Authority*, 249 S.W.2d 551 (Ark. 1952) ; and *State* v. *Rich*, 110 N.E.2d 778 (Ohio 1953). We have examined carefully those and numerous other judgments,[39] and have been unable to find a single one in which a court has decided a proceeding on the merits after a showing that one of the parties never had any interest in the litigation nor desired to proceed with it, and that the other party had complete control of all proceedings and issues.

In the *Dolley* case, the state filed a petition for mandamus against the bank commissioner and the state treasurer requiring them to recognize to the national banks the privilege of participating in the benefits of a certain act of the state. Several banks were joined as defendants. The said officers filed an answer refusing to recognize such privilege and cited an opinion of the comptroller in support of their refusal. Some of the banks filed a motion for dismissal on the ground that no real controversy existed between the parties. The Supreme Court of Kansas refused to dismiss the action applying the rule, already approved in this opinion, that an action may be friendly or may be brought

---

[38] Says the Commonwealth in its brief: "Considering the peculiar circumstances of this case in the light of the social interest which determined the propriety of this action, and considering the enormous public importance which the dismissal of the appeal would entail, we believe that this Hon. Court should not bar the road to this action for its final adjudication." The argument touching the public interest of this case is repeated throughout this brief as much as in that of the Housing Authority.

[39] Situations similar to those in the cases cited by the plaintiffs are found in *Moore* v. *Caldwell County et al.*, 176 S.E. 580 (N.C. 1934) ; *Matter of De Lucca, supra; Northridge Park County Water District* v. *McDonell*, 322 P.2d 25 (Cal. 1958) ; *Bailey* v. *Johnson County*, 54 Pac. 80 (Cal. 1898) ; *Golden Gate Bridge and Highway District* v. *Felt*, 5 P.2d 585 (Cal. 1931) ; *Price* v. *Sixth District Agricultural Ass'n*, 258 Pac. 387 (Cal. 1927) ; *W.E. Bowen Improvement Co.* v. *Van Hafften, supra; Parker* v. *State, supra; McCoy* v. *Carran, supra; Cone* v. *Gilmore, supra.*

for the purpose of testing an official act, without being collusive. It held that " . . . . In order for judicial power to be exercised with regard to the statute, there must be an actual and concrete controversy regarding it—a definite act demanded under it on the one hand and refused on the other. . . . " It added the following: " . . . . The fact that here the plaintiff has joined as defendants all persons supposed to have an interest in defeating its contention precludes any suggestion of a purpose to mislead the court into making a ruling without both sides of the question having been fairly presented. . . . " (At 848.) This notwithstanding, the court maintained alive the motion for dismissal so that in the future it could be determined whether or not the contention that no national bank had requested to participate in the benefits of the act was correct.

In the *Adams* case, the plaintiff boarded a streetcar for the purpose of testing the validity of a ten-cent fare charged by the grantees of the franchise. He paid ten cents and then sued the company. Said the Supreme Court of Rhode Island:

"Another point taken by the defendant is that, because the plaintiff boarded the cars for the purpose of making a test case, this is a moot case, which the court will not entertain. A moot case is one which seeks to determine an abstract question, which does not rest upon existing facts or rights. Where a concrete case of fact or right is shown, we know of no principle or policy of law which will deprive a party of a determination, simply because his motive in the assertion of such right is to secure such determination. . . ." (At 517.)

In *Blaize* v. *Hayes*, the plaintiff, who had been appointed to the office of sheriff and collector of revenues by the governor of the state, filed a petition for mandamus against the supervisor of public funds and the collector of revenues to compel them to surrender the office of tax collector. The officers in question contested the validity of the appointment. Several hundred taxpayers sought intervention alleging that

the suit was collusive. Four Justices of the Supreme Court of Louisiana ruled that the taxpayers could not intervene because it was a test case and not a collusive suit, and that there was some dispute or doubt on the validity of the appointment made by the governor which the court was bound to decide. Three Justices dissented, holding that the taxpayers had a right to intervene, that the person who was actually in possession of the office of tax collector was not a party in the litigation, and that the charges of collusion should be investigated by the court.

In *Rowe* v. *Housing Authority*, the constitutionality of the Urban Redevelopment Law of Arkansas was attacked in a taxpayer's suit.[40] Other property owners of the affected area appeared before the Supreme Court and claimed that the suit was "too friendly," and sought intervention in order that the rule of res judicata might not foreclose subsequent litigation involving factual questions. In view of that situation, the parties stipulated that the adjudication should be confined to the constitutional questions raised by the plaintiff. The court honored the stipulation and proceeded to decide the constitutional questions. No allegation was made in this case and, consequently, neither was any adjudication made on plaintiff's interest in the action or in the conduct of the suit.

Lastly, in *State* v. *Rich*, a petition was filed in the Supreme Court of Ohio by the solicitor of Cincinnati for a writ of mandamus against certain city officials requiring them to execute a loan note for the sum of $100,000, to be invested in an urban-redevelopment project. The defendants answered refusing to perform such act and alleging that if they were to perform it they would violate their oaths of office and participate in the illegal expenditure of funds. Certain property owners of the affected area inter-

---

[40] By Act No. 2 of February 25, 1946 (Sess. Laws, p. 6, 32 L.P.R.A. § 3074), taxpayer's suits are forbidden in Puerto Rico.

vened in the suit and raised, among other defenses, that the
action was an amicable action and that the defendants had
no right to question the validity of the acts in litigation.
The court rejected this defense on the ground that in the
State of Ohio a practice had arisen permitting such amicable
actions involving a bona fide justiciable controversy. Such
practice had resulted in the giving by the court of what in
reality were advisory opinions, without the weight of ordi-
nary precedents. The court defined the rule prevailing in
that jurisdiction as follows: ". . . . where a question of
general public interest is raised, some courts have taken the
view that an officer may make such a defense in a man-
damus suit, even where there is some doubt that the respond-
ent has any rights in the matter." (At 783.) In view of
that practice and of the special circumstance that certain
property owners sought intervention to oppose the petition,
the court decided the appeal on the merits. It is to be
noted that even in this case, which is probably one of those
which has gone farther in permitting this class of litigation,
the factors of total absence of interest of one of the parties
and complete control of the litigation by the other, which
characterize Aguayo's case, are not present.

Without it being understood that we are sanctioning the
criteria therein applied, we submit that none of the judicial
decisions cited by the plaintiffs applies to the facts of this
case. On the other hand, the United States Supreme Court
and other appellate courts have emphatically refused to
decide on the merits actions in which the public interest has
been the *sole* justification for exercising the judicial function,
although on certain occasions they have cited that factor as
a ground, along with others, for rejecting a contention that
a case has become moot. Diamond, *op. cit.* at 138, and cases
therein cited.

"If, as is contended on behalf of the plaintiff in error, the
question involved in this case is one of great importance to
the railroad company and to the State, and is identical with

that in a number of other cases pending in the court below, so much the more important is it that it should not be decided in a case where there is nothing in dispute. . . ." *Little* v. *Bowers, supra* at 558.

And in *California* v. *San Pablo and Tulare Railroad Co.*, 149 U.S. 308 (1893), the United States Supreme Court declined to make an adjudication on the merits of a suit which in its opinion had become moot, even though the attorney general of California prayed for such a judgment alleging that it was of "utmost importance to the people of the State of California." (At 313.) See, also, in this connection, *Northridge Park County Water District* v. *McDonell, supra* at 29; *Atlantic Seaboard Corp.* v. *Federal Power Commission*, 200 F.2d 796, 797 (C.C.A. 4, 1953); *Campbell Soup Co.* v. *Martin*, 202 F.2d 398, 399 (C.C.A. 3, 1953); *Louisville Transit Co.* v. *Department of Motor Transportation*, 286 S.W.2d 536, 538 (Ky. 1956); *Fugel* v. *Becker*, 2 S.W.2d 743, 746 (Mo. 1928); *Moore* v. *Smith*, 160 P.2d 675, 681 (Kan. 1945); *Ohio Contract Carriers Ass'n* v. *Public Utilities Comm.*, 42 N.E.2d 758, 759 (Ohio 1942); *Grossman* v. *Statt*, 300 N.Y.Supp. 152, 154 (1937).

Our judgment in this case, however, cannot rely mainly on the authority of the precedents. The decisive consideration must be the effect that our decision might have on the system of government and, specifically, on the position of the judicial bodies within that system.

We must not overlook the fact that judicial review is the distinguishing characteristic of our political system. Historical circumstances and the creative genius of John Marshall propitiated its genesis and development at the birth of the American nation in the early years of the nineteen century. Since then and uninterruptedly the institution has been the subject of an active national debate, as a whole dramatic, violent at times, and on one occasion tinged with blood, as to its origin, characteristics, and concrete manifestations. This is not, however, the moment to describe

that debate, nor is it necessary to elaborate this opinion with any reference to such struggle. It is enough to recall that the dispute centers on the manner of allocating the powers of government among the representatives of the people, who receive electoral mandates subject to periodical revocation, and the judges, who by known reasons hold life positions beyond direct electoral action. Every generation of judges and political officials has given a different solution to some of the vital problems of its times, according to the historical circumstances and the position taken in the face of this crucial question.

In the course of that debate, the United States Supreme Court has established very valuable standards of self-restraint to govern its conduct in situations requiring the exercise of its "grave and delicate function" of passing upon the constitutional validity of legislative measures. A great majority of them and the applicable precedents have been covered by Mr. Justice Brandeis in his now classical concurring opinion [41] in *Ashwander* v. *Tennessee*, 297 U.S. 288, 346 (1935). They are as follows:

"1. The Court will not pass upon the constitutionality of legislation in a friendly, non-adversary, proceeding, declining because to decide such questions 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy. . . .'

"2. The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it. . . .'

"3. The Court will not 'formulate a rule of constitutional law broader than is required. . . .'

"4. The Court will not pass upon a constitutional question although properly presented by the record, if there is also

---

[41] " . . . . The Ashwander concurring opinion is generally and justly regarded as the crowning statement of one of the truly major themes in Brandeis' judicial work: the conviction that the Court must take the utmost pains to avoid precipitate decision of constitutional issues, and that it must above all decide such issues only when it is absolutely unable otherwise to dispose of a case properly before it." Bickel, *The Unpublished Opinions of Mr. Justice Brandeis* 2 (1957).

present some other ground upon which the case may be disposed of. . . .

"5. The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation. . . .

"6. The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits. . . .

"7. 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided. . . .' "

In recent years a further restriction has been added: the Court will not undertake to pass upon a constitutional question if the record is not adequate to make a determination of that nature. *Rescue Army* v. *Municipal Court*, 331 U.S. 549, 575 (1946); *International Brotherhood* v. *Denver Milk Producers*, 334 U.S. 809 (1948); *Parker* v. *Los Angeles*, 338 U.S. 327, 329 (1949).

The presumption of constitutionality which the Court has attached to every legislative measure and the rule not to intervene in "political" controversies may also be considered as a further manifestation of that spirit of self-restraint. Cahn (ed.), *Supreme Court and Supreme Law* (1954), *passim*, and particularly at pp. 109–39; *Luther* v. *Borden*, 7 How. 1 (1849); *Pacific Tel. Co.* v. *Oregon*, 223 U.S. 118 (1912); *Coleman* v. *Miller*, 307 U.S. 433 (1939); *Colegrove* v. *Green*, 323 U.S. 549 (1946).

What are the underlying reasons of those restrictions? Have they been created to satisfy the exigencies of technical niceties, or are they, on the contrary, founded on a conviction arising from reason and experience, as to the manner of exercising the difficult judicial responsibility of passing upon the constitutionality of legislative actions? There is no question that they constitute a minimum of conditions for the discreet and tolerable exercise of a power which would

otherwise constitute a clear threat to the democratic quality of the system and would convert the judges into guardians of the community. The determinant factors of these norms are the fallibility of the human judgment,[42] the negative condition of the judicial power which has not the direct authority inherent in the other two branches because they are elected by the people, and the conviction that the Court would lose its influence and prestige and, ultimately, its authority if it should every day and outside the strict limits of a genuine judicial proceeding, pass judgment on the constitutional validity of legislative and executive actions.

" . . . . As governmental problems become more and not less complicated, as the dislocating impact of technological advances becomes more powerful and less imperceptible, as the forces of economic interdependence demand more and more determination and ingenuity for the maintenance of a simpler but perhaps socially more satisfying society, the deep wisdom of the Court's self-restraint against undue or premature intervention, in what are ultimately political controversies, becomes the deepest wisdom of our times." [43]

Because of the requirements of the governmental system, both the state courts and this Court have adopted those norms of self-restraint. *Buscaglia, Treas.* v. *Tax Court*, 71 P.R.R. 278, 282 (1950) ; *Sp. Am. Tobacco Co.* v. *Buscaglia, Treas.*, 71 P.R.R. 929, 931 (1950) ; *Walker* v. *Tax Court*, 72 P.R.R. 651, 658 (1951) ; *People* v. *Marrero*, 79 P.R.R. 610, 613 (1956) ; *Government of the Capital* v. *Executive Council*, 63 P.R.R. 417, 446 (1944) ; *Simonet* v. *Sandoval*, 63 P.R.R. 503, 506 (1944) ; *García & González* v. *Treasurer*, 56 P.R.R. 627, 631 (1940) ; *F. Febles & Co.*

---

[42] " . . . . It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility." Cooley, *Constitutional Limitations* 332, 8th ed., cited in 297 U.S. 345.

[43] Felix Frankfurter and Henry M. Hart, Jr., *The Business of the Supreme Court at October Term, 1934*, 49 Harv. L. Rev. 68, 107 (1935).

v. *Treasurer*, 50 P.R.R. 742, 744 (1936); *People* v. *White Star Bus Line, Inc.*, 45 P.R.R. 148, 155 (1933). However, in this case there is one other factor. Section 4 of Art. V of our Constitution, in expressly recognizing to this Court the power to pass upon the constitutionality of the laws, provides as follows: "No law shall be held unconstitutional except by a majority of the total number of Justices of which the Court is composed in accordance with this Constitution or with law." That limitation is not found in the Federal Constitution nor in those of a great majority of the states of the Union. Why was it included in ours? Fortunately, the lengthy debate which preceded its approval by the Constituent Convention gives us the answer. It is explained, briefly, in the following words:

"I wish to say that for some time people concerned with these constitutional problems have been questioning whether it is valid, whether it is reasonable for a small group of judges . . . to have the prerogative of going against the express will of the people in formulating a legislative program which is thereafter enforced by the lawmakers elected on the basis of that program.

". . . . What should be done is simply that a law—and let us not say law when it is already in the statutes—that a provision which the House of Representatives thought was good and constitutional, and which a Senate thought was good and constitutional, and which an Executive thought was good and constitutional, before it became a law, should not be declared that it is not, unless it is so decided by a majority of the Justices, so that a decision which goes against a majority of the House, against a majority of the Senate, and against the opinion of the Executive, should not be the ruling of a minority of the court." [44]

Evidently, the Convention was fully conscious of the "gravity and delicacy" of this judicial function and took

---

[44] Statements of delegate Víctor Gutiérrez Franqui in Journal of Proceedings, Constituent Convention of Puerto Rico, December 3, 1951, at pp. 215, 217.

action to limit the same even more than what the federal courts have voluntarily done.

It is indeed a shocking sight to think of a society in which judges appointed for life have the power to pass upon the constitutionality of official acts solely on behalf of the "public interest." Let us mark the scope of such concession: First, it would necessarily cover legislative as well as executive actions and constitutional questions as well as questions of interpretation and application of the laws, for there would be no reason in logic or at law to permit attack on some and not on others. Second, it would cover questions raised by private individuals and public agencies, for neither would there be any point at all in recognizing the latter and not the former. Lastly, it would cover practically all phases of the life of the community. In a society such as ours, where by economic and social demands the government's action penetrates in many of the most hidden aspects of individual behavior, it is difficult to find questions which are not affected one way or the other by the "public interest." [45]

The present case is a good example of the serious dangers which we have pointed out. For reasons of "public interest" we are urged to pass upon the constitutionality of the following: (a) the power of the Commonwealth and of the Housing Authority to condemn property for private use and to be transferred to private individuals; (b) the power of the Commonwealth and of the municipality of Arecibo to make

---

[45] It is to be noted that this proposition goes farther than the system of advisory opinions existing in seven states of the Union. In this system are specifically designated the public officers or agencies who may request an opinion and the occasion when such request may be made. Request for opinion is made before the political agency performs the act on which there is doubt. Even with these limitations, the system has been the subject of severe criticism. See, in general, Pedro Muñoz Amato *et al.*, *La Nueva Constitución de Puerto Rico* 463–64 (1954); Hudson, *Advisory Opinions in National and International Law*, 37 Harv. L. Rev. 970 (1924); Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1005 (1924); Veeder, *Advisory Opinions of the Judges of England*, 13 Harv. L. Rev. 358 (1900).

local grants, by way of donation of funds and property, to be used by the Authority in the redevelopment of blighted areas, and the power of the Authority to accept such grants; (c) the power of the Authority to borrow money and to issue bonds and other securities for reurbanization purposes; (d) the power of the Authority to dispose of reurbanized lands at less than the purchase price; (e) the powers of the Authority, the Planning Board, and the municipality of Arecibo to determine the existence of a slum area, to prescribe the conditions of the redevelopment project, to select purchasers or lessees, and to fix the selling or lease price; and (f) the powers of the Authority to engage in sale operations involving real property and to own lands in excess of 500 acres. Further, whether various laws comply with the requirement as to title and subject matter provided in § 17, Art. III of the Constitution, and whether or not they are unconstitutional as not having been re-enacted by the Legislative Assembly after the promulgation of the Constitution of 1952.

Summing up, in this case, and solely on behalf of the "public interest," we are at this time urged by the Commonwealth and the Housing Authority to make an adjudication which would affect the validity of the bulk of the legislation in force in this country and the constitutionality of some of the most important powers of the Commonwealth and of some of its principal agencies. Should we comply, other public agencies or private individuals or entities would in the future have a clear right to raise similar issues before this Court. The basic principle of judicial review would thus be definitively defeated: the constitutionality of a government act may be judged only within the limits of an actual controversy between adverse litigants, in which it is necessary to pass upon the constitutionality of the act in order to settle the controversy arising between the litigants.[46]

---

[46] " . . . . [The] judicial power, as we have seen, is the right to determine actual controversies arising between adverse litigants, duly

If we discard that principle and instead place that of the "public interest," this Court would become a hateful "third chamber" or supreme council with power to impose a final veto on the activities of the government in the innumerable occasions in which the "public interest" may be affected.[47]

We are fully aware of the legitimate motives which impel the plaintiffs in this case and realize the social and economic importance of the urban-renewal program. But even so, we must not let the justified restlessness of the moment impel us to lay down a doctrine which may only result in a very serious enlargement of the judicial power. Even assuming that we possessed the necessary wisdom, we would have to refuse, out of respect to the sovereignty of the people, to play in our society the same role that Plato assigned to the philosophers-kings in his Republic.[48]

This should not be one more occasion where the defense of a vital principle should provoke the shifting of responsi-

---

instituted in courts of proper jurisdiction. The right to declare a law unconstitutional arises because an act of Congress relied upon by one or the other of such parties in determining their rights is in conflict with the fundamental law. The exercise of this, the most important and delicate duty of this court, is not given to it as a body with revisory power over the action of Congress, but because the rights of the litigants in justiciable controversies require the court to choose between the fundamental law and a law purporting to be enacted within constitutional authority, but in fact beyond the power delegated to the legislative branch of the government. . . ." *Muskrat* v. *United States, supra* at 361. See, also, *Chicago & Grand Trunk Ry Co.* v. *Wellman, supra* at 344–45.

[47] Even applying the orthodox rule, there arise very delicate problems in the relations between judges and political officers which require constant adjustment and mutual understanding of their powers and responsibilities. Recent views on the problem are covered in Learned Hand, *The Bill of Rights* (1958), *passim;* Carl Brent Swisher, *The Supreme Court in Modern Role* (1958), *passim,* and particularly at 3–65 and 153–91; Edward McWhinney, *Judicial Review in the English-Speaking World* (1956), particularly at 170–85; Dwight J. Simpson, *Robert N. Jackson and the Doctrine of Judicial Restraint,* 3 U.C.L.A. Rev. 325 (1956); and Edmond Cahn (ed.), *Supreme Court and Supreme Law* (1954), *passim.* *Cf.* Fisher, *The Supreme Court of India and Judicial Review,* 9 Syracuse L. Rev. 30 (1957).

[48] *The Republic of Plato,* translated by Francis MacDonald Cornford (1945), *passim,* and particularly at 175–263; Popper, *The Open Society and Its Enemies* 119–53 (1950).

bilities. It is the responsibility of federal officers to make proper determinations on federal aid for the urban-renewal program of Puerto Rico, taking into consideration, however, the presumption of validity attached to legislative determinations and the decisions of this Court,[49] of the United States Supreme Court,[50] and of an immense majority of the

[49] *Commonwealth* v. *Fajardo Sugar Co.*, 79 P.R.R. 303 (1956)—the condemnation of a parcel by the Development Company to be sold or leased to a private person is constitutional; *People* v. *Saldaña*, 69 P.R.R. 663 (1949)—the power of condemnation of the Land Authority is not limited to entities holding more than 500 acres, and condemnation for the establishment of proportional-benefit farms, distribution and transfer of lands to squatters, and the distribution in individual farms, is constitutional; *Municipality* v. *Planning Board*, 68 P.R.R. 600 (1948)—condemnation of lands for slum clearance is constitutional; *P. R. Housing Authority* v. *District Court*, 68 P.R.R. 50 (1954)—the Authority has power to condemn private property, subject to the same constitutional restrictions as the State (*affirmed*, 171 F.2d 563 (1949); *McCormick* v. *Marrero, Judge*, 64 P.R.R. 250 (1944)—condemnation under a law which contains public-benefit elements and for a purpose of a public character is constitutional, and the question as to how much benefit is to be derived by the public is one for the Legislative Assembly and not for the courts. See, also, *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316 (1946), *cert. denied*, 329 U.S. 772 (1946), which upheld the constitutionality of a condemnation for the purposes of the Land Law and, specifically, to sell or lease the land to private persons.

[50] The main precedent in the federal jurisdiction is *Berman* v. *Parker*, 348 U.S. 26 (1954), which also covers the greater part of previous decisions. That case upheld the constitutionality of the District of Columbia Redevelopment Act, which is practically identical with ours, and the following principles were therein established: (1) the legislature, not the judiciary, is the main guardian of the public needs to be served by public legislation, including condemnation laws; (2) it is not for the courts to determine if a housing project is desirable or not; (3) the concept of the public welfare includes both physical and spiritual values and aesthetic and monetary values; (4) once the public welfare is established, the right to attain it through the power of eminent domain is clear, and the determination of the means to be used is exclusively for the Congress; (5) the Congress may select a private agency to assume charge of the redevelopment, and may sell or lease the condemned land to private persons; (6) the whole affected area may be condemned notwithstanding it contains property in good condition; (7) the standards fixed in the act of the District of Columbia are sufficient to sustain the delegation of authority to administrative agencies; (8) once the public purpose has been determined, the amount and character of the lands necessary to carry out an integrated plan rests in the legislature; (9) the rights of property owners are satisfied when they receive the just compensation required by the Fifth Amendment, (10) the power of Congress

states.[51]   It is our duty, and we are fully satisfied that we have done it, to decide this appeal upon the facts proved and to decline to upset the present constitutional order and the proper relations between the political and the judicial bodies of the State.

## V

We now turn to discuss the conduct of the Superior Court and of the parties and attorneys in this appeal.

It is our duty, in the first place, to exonerate the court of first instance from any responsibility.   The latter exercised its functions in accordance with the papers submitted to it and without having any reason, which is not the case in this Court, to launch an investigation into the relations between the parties.   Hereafter, of course, the courts of first instance must abide by the standards set out in this opinion, exercising special vigilance in the proceedings brought under Rule 7(d).

Nor are the Commonwealth officers and the Department of Justice responsible for intervening one way or the other

over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.  See, also, Quintin Johnstone, *The Federal Urban Renewal Program*, 25 U. Chi. L. Rev. 301 (1958) ;  Roger P. Marquis, *Constitutional and Statutory Authority to Condemn*, 43 Iowa L. Rev. 170 (1958) ;  *Validity, Construction and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise*, 44 A.L.R.2d 1414 (1955) ;  *The Public Use Limitation on Eminent Domain: An Advance Requiem*, Note in 58 Yale L. J. 574 (1949) ;  McDougal and Mueller, *Public Purpose in Public Housing: An Anachronism Reburied*, 52 Yale L. J. 42 (1942).

[51] Johnstone points out in *op. cit. supra* at 312, that forty-two states, the District of Columbia, Alaska, Hawaii, the Virgin Islands, and the Commonwealth of Puerto Rico have urban-renewal legislation.  Only in Florida, Georgia, Kansas, and South Carolina have enabling acts been held unconstitutional.  However, new legislation has been enacted in Georgia and Kansas and there are several projects under way in those states.  The decisions of Florida and South Carolina are based on a concept of "public use," which does not exist in our jurisdiction.  Compare *Edens* v. *City of Columbia*, 91 S.E.2d 280 (S.C. 1956), and *Adams* v. *Housing Authority*, 60 So.2d 663 (Fla. 1952), with *Commonwealth* v. *Fajardo Sugar Co., supra*, and *McCormick* v. *Marrero, supra*.  See, also, Joseph Guandolo, *Housing Codes in Urban Renewal*, 25 Geo. Wash. L. Rev. 1, 50 (1956), and the note *supra* in 44 A.L.R.2d 1414 (1955).

in the proceedings. The evidence shows that such intervention was mostly *pro forma*,[52] with the exception of that of Lic. Aurelio Torres Braschi. The latter, together with Lic. Rafael B. Pérez Mercado, participated in the preparation of a proposal of findings of fact and conclusions of law for the Superior Court and of the brief for appellants which was submitted to this Supreme Court. Thereafter, and after consulting with the Land Division of the Department, he set up and submitted to the Superior Court a memorandum stating that there was no objection to the request for the withdrawal of funds made by the defendant. The evidence also shows that neither Lic. Torres Braschi nor any other officer of the Department was aware of the peculiar circumstances surrounding this case, nor of the relations between the plaintiff Housing Authority and defendant Martín Aguayo and between the latter and Lic. Jorge V. Toledo.

Lic. Octavio Malavé Torres and Lic. Pablo Defendini, attorneys for the Authority, are in a similar position. The former intervened in this case for the sole purpose of appearing as attorney of record for the Authority when Lic. Pérez Mercado ceased in his functions as legal adviser for the plaintiff. On a certain occasion he also helped Lic. Pérez Mercado with the legal research. On November 20, 1956, Lic. Defendini was appointed Chief of the Legal Division of the Authority. On that date this proceeding had already been brought in this Court. As the Authority's attorney, he subscribed the motion of October 8, 1957, setting forth the interest of the parties in the prosecution of the case. He did so after conferring with Lic. Rodríguez Ema and Lic. Ramírez, from whom he gathered the impression that nothing abnormal would occur in the case.

---

[52] The facts of this case point to the necessity for the Department of Justice to take active part, from the beginning, in every litigation challenging the constitutionality of an act, in performance of the duty assigned to it by Act No. 47 of April 25, 1931 (32 L.P.R.A. § 3001), and Act No. 451 of May 14, 1952 (32 L.P.R.A. § 353).

The position of the litigants César Cordero Dávila (in representation of the Authority) and Martín Aguayo, and attorneys Rafael Rodríguez Ema, Rafael B. Pérez Mercado,[53] Jorge V. Toledo, and Efraín Ramírez Ramírez, is different. The evidence shows clearly that they had knowledge of all or most of the facts which have been recited in Part II of this opinion and which convinced this Court that this case is fictitious. Under other circumstances and for such reason, we would have decreed that contempt proceedings be commenced against those parties and disciplinary action taken against those attorneys.

We are convinced, however, that the conduct of the parties and of the attorneys was due exclusively to their desire to save the urban-renewal program from the hardships of a decision cutting off the federal aid. They were not moved by any consideration of personal profit or advantage; on the contrary, they only had in mind the public interest. The case was submitted for the final disposition of the questions which affected the constitutionality of the urban-renewal laws, and, as explained by Lic. Pérez Mercado in his testimony, "not even remotely did it occur to them [the parties and their attorneys] to fabricate a case to contemn and show disrespect to the Court." Also, this is the first time this Court is called upon to construe Rule 7(d), and also the first time it has occasion to determine the weight to be given in our jurisdiction to the factor of "public interest" in the exercise of the judicial power to review the constitutionality of the laws. There is a great number of precedents on both points, both in the federal and in the state jurisdiction, which do not follow a uniform pattern and therefore lend themselves to conflicting interpretations. Cf. Acosta v. Crespo, 70 P.R.R. 223, 235, n.1 (1949); Díaz v. González, 74 P.R.R. 935, 939 (1953); Great Northern R. Co. v. Sunburst Oil

---

[53] Lic. Pérez Mercado resigned his post with the Authority after the briefs in the case were filed in this Court, and since then his intervention ceased in this proceeding.

*and Refining Co.,* 287 U.S. 358, 363 (1932); Patterson, *Jurisprudence, Men and Ideas of the Law* 577–79 (1953).

For the reasons stated, we will take no action of any kind against the litigants and their attorneys. It is evident that in the future other persons will not be able to seek protection on the basis of those considerations.

The judgment of the Superior Court will be reversed and the case remanded with instructions to dismiss the proceeding for lack of jurisdiction.